IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| MARINER IC INC., <br><br>        Plaintiff, <br><br> vs. <br><br> FUNAI ELECTRIC CO., LTD., ET AL., <br><br>        Defendants. | Civil Action No. 2:16-cv-525-JRG-RSP <br> Lead Case <br><br> Jury Trial Demanded |
| MARINER IC INC., <br><br>        Plaintiff, <br><br> vs. <br><br> MEDIATEK INC., and MEDIATEK USA INC., <br><br>        Defendants. | Civil Action No. 2:16-cv-435-JRG <br><br> Jury Trial Demanded |

**MEDIATEK INC. AND MEDIATEK USA INC.'S MOTION TO DISMISS FOR LACK OF STANDING OR,**
**ALTERNATIVELY, FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

## Table of Contents

INTRODUCTION ........................................................................................................ 1

    I       Statement of the issues ........................................................................ 1

    II     Background ........................................................................................ 2

          A.     The alleged acquisition of the patents by Mariner ..................................... 2

          B.     The Patent Sale Agreement ........................................................... 3

          C.     The security interest held by Intellectual Ventures Assets 16 ................... 6

          D.     The patent allegations asserted by Mariner ................................. 7

ARGUMENT ............................................................................................................. 8

    I       Mariner lacks standing to sue for patent infringement ........................................... 8

          A.     Intellectual Ventures Assets 16 failed to transfer all substantial rights in the patents to Quest, rendering the "assignment" to Quest merely a non-exclusive license ................................................................. 8

          B.     Mariner is, at most, a mere licensee without standing to sue for infringement ........................................................................... 17

          C.     At minimum, Intellectual Ventures Assets 16 and any other holders of substantial rights are necessary parties required to be joined to satisfy standing ........................................................................ 18

    II     Mariner's Complaint fails to state a claim upon which relief can be granted ...... 18

          A.     Mariner's Complaint must demonstrate some basis for its allegation and allege specific facts in support of each claim ..................................... 19

          B.     Mariner's Complaint fails to plead sufficient facts to support its direct infringement claims ................................................................. 20

CONCLUSION ......................................................................................................... 24

## Table of Authorities

**Cases**

*Abbott Labs v. Diamedix Corp.*,
    47 F.3d 1128 (Fed. Cir. 1995) ............................................................................................... 12

*Alfred E. Mann Found. For Sci. Research v. Cochlear Corp.*,
    604 F.3d 1354 (Fed. Cir. 2010) ....................................................................................... 12, 14

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937 (2009) ........................................................................... *passim*

*Aspex Eyeware, Inc. v. Miracle Optics, Inc.*,
    434 F.3d 1336 (Fed. Cir. 2006) ............................................................................................. 14

*AsymmetRx, Inc. v. Biocare Medical, LLC*,
    582 F.3d 1314 (Fed. Cir. 2009) ............................................................................................... 9

*Barlow v. Stevenson*,
    2000 Del. C.P. Lexis 62 (Del. C.P. 2000) ............................................................................. 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955 (2007) ............................................................................... 2, 19

*Bowlby v. City of Aberdeen*,
    681 F.3d 215 (5th Cir. 2012) ................................................................................................. 20

*Collins v. Morgan Stanley Dean Witter*,
    224 F.3d 496 (5th Cir. 2000) ................................................................................................. 20

*Diamond Coating Technologies, LLC v. Hyundai Motor Am., et al.*,
    823 F.3d 615 (Fed. Cir. 2016) ............................................................................... 9, 12, 13, 17

*Enzo APA & Son, Inc. v. Gepag A.G.*,
    134 F.3d 1090 (Fed. Cir. 1998) ............................................................................................. 18

*In re Bill of Lading Transmission and Processing Sys. Patent Litig.*,
    681 F.3d 1323 (Fed. Cir. 2012) ....................................................................................... 18, 19

*Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*,
    248 F.3d 1333 (Fed. Cir. 2001) ............................................................................................. 12

*IP Innovation L.L.C. v. Google, Inc.*
    661 F.Supp.2d 659 (E.D. Tex. Sept. 21, 2009) ..................................................................... 16

*McZeal v. Sprint Nextel Corp.*,
    501 F.3d 1354 (Fed. Cir. 2007) ....................................................................................... 18, 20

*Mediatek, Inc. v. Sanyo Elec. Co. Ltd., et al.*,
No. 6:05-cv-00323-LED, 2007 WL 5186792 (E.D. Tex. April 16,
2007) ................................................................................................................... 17

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
240 F.3d 1016 (Fed. Cir. 2001) ......................................................................... 12

*Morrow v. Microsoft Corp.*,
499 F.3d 1332 (Fed. Cir. 2007) ................................................................. *passim*

*Prima Tek II, L.L.C. v. A-Roo Co.*,
222 F.3d 1372 (Fed. Cir. 2000) .................................................................. 12, 17

*Propat Int'l Corp. v. RPost Inc.*,
473 F.3d 1187 (Fed. Cir. 2007) ................................................................. *passim*

*Rite-Hite Corp. v. Kelley Co.*,
56 F.3d 1538 (Fed. Cir. 1995) ........................................................................... 11

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
215 F.3d 1246 (Fed. Cir. 2000) ......................................................................... 21

*Ruby Sands LLC v. American National Bank of Texas*,
No. 2:15-cv-01955-JRG, 2016 WL 3542430 (E.D. Tex. June 28, 2016) ............................. 19

*Secure Axcess, LLC v. Dell Inc., et al.*,
No. 6-11-cv-00338 (E.D. Tex. September 24, 2012), slip op. ................................................. 9

*Sicom Sys. Ltd. v. Agilent Techs., Inc.*,
427 F.3d 971 (Fed. Cir. 2005) ................................................................... *passim*

*Solocron Education, LLC v. HealthStream, Inc.*,
No. 2:16-cv-00016-JRG (E.D. Tex., June 7, 2016), slip op. ................................................. 19

*Speedplay, Inc. v. Bebop, Inc.*,
211 F.3d 1245 (Fed. Cir. 2000) ......................................................................... 10

*Textile Prods., Inc., v. Mead Corp.*,
134 F.3d 1481 (Fed. Cir. 1998) ......................................................................... 10

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*,
944 F.2d 870 (Fed. Cir. 1991) ................................................................. 9, 10, 12

**Statutes**

2016 Del. Code Ann. tit. 6, § 9-610 ......................................................................... 7

35 U.S.C. § 271 .............................................................................................. 20, 21

Fed. R. Civ. P. 12(b)(1) ........................................................................................................... 24

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 18, 24

Fed. R. Civ. P. 12(b)(7) ........................................................................................................... 24

Fed. R. Civ. P. 19(a) ................................................................................................................ 11

Fed. R. Civ. P. 8 ................................................................................................................ 19, 24

## INTRODUCTION

Defendants MediaTek Inc. and MediaTek USA Inc. (together "MediaTek") respectfully submit this Motion under Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 8, 12(b)(1), and 12(b)(6) seeking an Order dismissing Plaintiff Mariner IC Inc.'s ("Mariner's") Complaint for Patent Infringement.

## I    Statement of the issues

Mariner filed its Complaint against MediaTek on the same date that Semcon IP Inc. filed suits against MediaTek and several other defendants in this District.  Among those suits was one against STMicroelectronics, *Semcon IP Inc. v. STMicroelectronics Inc. et al.,* No. 2:16-cv-00439 (E.D. Tex. April 25, 2016), (the "*Semcon* Matter").  On July 6, 2016 STMicroelectronics filed a Motion to Dismiss for Lack of Standing or, Alternatively for Failure to State a Claim Upon Which Relief can be Granted (the "STMicro Motion").  *Id.*, Dkt. No. 22. The patents purportedly owned by Mariner were obtained by Mariner's corporate parent, Quest Patent Research Corporation ("Quest") from Intellectual Ventures Assets 16 LLC ("IV16") in the same series of transactions as the patents at issue in the *Semcon* Matter.  Therefore, many of the facts and arguments in this motion mirror those presented in the STMicro Motion.

Mariner's Complaint alleges direct infringement of two patents, each of which Mariner purportedly owns by virtue of a patent purchase agreement between IV16 and Quest and a purported assignment from Quest to Mariner that followed.  The Complaint alleges that "Mariner is the sole and exclusive owner of all rights, title, and interest in the '666 Patent and '874 Patent." Compl. at ¶ 9.  The term "'666 Patent" is defined by paragraph seven of the Complaint which states "[o]n July 22, 1997, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 5,**560**,666 (the "'666 Patent")."  *Id.* at ¶ 7  (emphasis added). All further references in the Complaint are to the "'666 Patent."  However, a different patent,

Patent No. 5,**65**0,666, is attached to Mariner's Complaint and listed in the relevant assignment documents.  None of the relevant documents purport to assign to Mariner Patent No. 5,**56**0,666, which is directed to a removable rack system for pick-up trucks.  Mariner has therefore asserted infringement of a patent to which it has no right at all.

In addition, even assuming Mariner intended to assert infringement of Patent No. 5,**65**0,666, IV16 reserved substantial rights to license Patent Nos. 5,650,666 and 5,846,874 and imposed significant restrictions on the ability of Quest to sell, transfer, assign, exclusively license, and to grant licenses with sublicense rights.  Such reservations of rights in the patents is fatal to any claim of standing by Quest or its purported assignee Mariner.

The Complaint itself is also deficient because it fails to sufficiently point out what is accused and the basis for the allegations therein.  Under *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S. Ct. 1955, 1960 (2007), a complaint must plead specific facts establishing "a claim to relief that is plausible on its face."  The pleading rules are designed to ensure that a plaintiff has some basis for its allegations and to put the defendant on reasonable notice of those allegations.  Mariner's conclusory patent infringement allegations satisfy neither purpose.  Accordingly, in the alternative, MediaTek respectfully requests this Court dismiss Mariner's direct infringement allegations for failure to state a claim upon which relief can be granted.

## II      Background

### A.      The alleged acquisition of the patents by Mariner

Mariner received its purported rights to Patent Nos. 5,650,666 and 5,846,874 following a long series of assignments.  IV16 ostensibly obtained ownership on September 24, 2015 through an assignment from Callahan Cellular LLC.  *See* Ex. 1, Assignment of Patent

Rights, dated September 24, 2015.[1]  IV16 subsequently executed agreements purporting to

transfer certain patents, including Patent Nos. 5,650,666 and 5,846,874, to Quest on October 22,

2015.  *See* Ex. 2, Assignment of Patent Rights, dated October 22, 2015 ("Quest Assignment").

Likewise, Mariner purportedly received all of the rights to Patent Nos. 5,650,666 and 5,846,874,

held by Quest, through assignment the following day, October 23, 2015.  *See* Ex. 3, Assignment

of Patent Rights, dated October 23, 2015 ("Mariner Assignment").

Mariner is a wholly owned subsidiary of Quest and maintains the same business

address as Quest in Delaware.  *See* Exs. 2 and 3 (both Quest and Mariner Assignments identify

the same business address); Ex. 4, Quest Patent Research Corporation Form 10-K, dated

December 31, 2015 ("Annual Report") at p. 5, F-7 (relevant portions highlighted for the Court's

convenience).  Mariner has one director, Jon Scahill.  *See* Ex. 5, Texas Secretary of State

Certificate of Formation; Ex. 6, Texas Secretary of State Business Organizations Inquiry.

Mr. Scahill is, or at least was as of February 29, 2016, the President and Chief Executive Officer

of Quest.  *See* Ex. 4, Annual Report at p. 10 ("As of February 29, 2016, we have no employees

other than our two officers, only one of whom, Mr. Jon Scahill, our chief executive officer and

president, is full time.").

**B.      The Patent Sale Agreement**

According to documents Quest filed with the SEC, IV16 and Quest entered into a

purported patent sale agreement, effective July 8, 2015.  *See* Ex. 8, Patent Sale Agreement

("Agreement") (relevant portions highlighted for the Court's convenience).[2,3]  The Agreement

---

[1]    All exhibits referenced herein are attached to the Declaration of Brandon C. Martin in
support of MediaTek Inc. and MediaTek USA Inc.'s Motion to Dismiss for Lack of Standing
or, Alternatively, for Failure to State a Claim Upon Which Relief can be Granted.

[2]    *See also* Ex. 4, Annual Report at p. 2 confirming execution of the patent sale agreement and
security interest.

purports to "sell[ ], assign[ ], transfer[ ], and convey[ ]" to Quest all of IV16's "right, title, and interest in and to" Patent Nos. 5,650,666 and 5,846,874. *Id.* at ¶ 2.1(a).  Quest purportedly acquired "all causes of action, enforcement rights and all other rights to seek and obtain any other remedies of any kind including monetary damages for past, current, and future infringement of any one or more of the Patents." *Id.*

Despite a provision claiming "no retention of substantial rights," IV16 did, in fact, retain substantial rights in Patent Nos. 5,650,666 and 5,846,874.  Ex. 8, Agreement at ¶ 3.3. Specifically, IV16 transferred the patent rights subject to "Existing Rights," as defined within the Agreement.  *Id.* at ¶ 2.1(a).  The Existing Rights include "the existing licenses, sublicenses, and other rights and obligations under the [relevant patents] that have been granted or retained by [IV16], Affiliates of [IV16], or prior owners or inventors of the [relevant patents] prior to the Effective Date."  *Id.* at ¶ 1.

Moreover, the Agreement defines the obligations owed by Quest to "Prior Rights Holder[s]" and specific ongoing licensing rights that IV16 retained with respect to those Prior Rights Holders.  *See id.* at ¶ 3.1(b).  Specifically, with respect to ongoing licensing rights retained by IV16, the Agreement provides that if IV16 or any of its affiliates

> has a contractual liability under the Existing Rights to (1) a Person who is a beneficiary of Existing Rights, or (2) a pre-existing licensee to the [relevant patents] under an Existing Right . . . [Quest] . . . grants to [IV16] and its Affiliates, Extension Rights, as well as the right to grant a limited, nonexclusive, perpetual, irrevocable, royalty-free, fully paid-up right and license (without geographic restriction), under the [relevant patents], to any Prior Rights Holder to make, have made, use, sell, offer for sale, import, and otherwise commercialize any product or service, solely to the extent necessary to eliminate any liability that Seller or any of its Affiliates may have to such Prior Rights Holder.

---

3   Quest filed its Patent Sale Agreement as Exhibit 99.7 to its 8-K filing dated October 22, 2015.  *See* Ex. 7 at p. 6 (relevant portion highlighted for the Court's convenience).

*Id.* at ¶ 3.1(b).  "Prior Rights Holders" under the Agreement include anyone "(1) who is a beneficiary of Existing Rights, or (2) a pre-existing licensee to the [relevant patents] under an Existing Right."  *Id.*  The "Extension Rights" retained by IV16 include the right to

> (i) renew and extend the term of any licenses or covenants not to sue granted by [IV16] and/or its Affiliates which constitute Existing Rights and (ii) modify or amend any such licenses or covenants not to sue in accordance with, and solely pursuant to, an obligation contained therein and solely per the terms and conditions of such license or covenant not to sue in existence as of the Effective Date[.]

*Id.* at ¶ 1.[4]

      The Agreement further grants IV16 the right to "extend the duration of Existing Rights," "extend Existing Rights to Affiliates of the holders of such Existing Rights," and "to enter into a license agreement with Optional Licensee."  *Id.* at ¶ 3.1(b).  Thus, in spite of purporting to transfer Patent Nos. 5,650,666 and 5,846,874 to Quest, IV16 actually retained substantial rights including the right to renew, extend, modify or amend certain licenses or covenants not to sue.  On information and belief, Prior Rights Holders include, but are not limited to, Intel, Nvidia, Sony, Fujitsu, NEC Corporation of America, and Nikon.  *See* Ex. 8, Agreement.  Thus, these and other parties may have licenses or covenants not to sue under one or more of the Patent Nos. 5,650,666 and 5,846,874 that are subject to renewal, extension or modification by IV16 or its affiliates, or a successor in interest, if any, to those rights.

---

[4]    The Agreement also restricts Quest's ability to transfer the patents.  Specifically, the Agreement requires that if [Quest] "transfers or assigns the Assigned Patent Rights…to any Person…," that such "Subsequent Transfer" be conditioned upon the Person agreeing "(i) to acquire the Assigned Patent Rights…subject to Existing Rights which are applicable to the Assigned Patent Rights…being transferred or assigned in such Subsequent Transfer, (ii) to assume all Flow Down Obligations…, (iii) to be bound by the Nikon CTSL…, and (iv) to bind all future assignees or transferees of the Assigned Patent Rights to the same provisions…."  *See* Ex. 8, Agreement at ¶ 2.1(b).  This restriction likely applies to Mariner as well.  *See infra* Argument § I.C.

### C.     The security interest held by Intellectual Ventures Assets 16

On October 23, 2016, IV16, Quest, and Mariner entered into an Addendum to the Agreement purporting to authorize assignment of Patent Nos. 5,650,666 and 5,846,874 to Mariner, subject to the "execut[ion] and prompt[ ] deliver[y]" of "a Security Interest Addendum." *See* Ex. 9, Patent Sale Addendum ("Addendum") at p. 1.  In the *Semcon* Matter, Semcon has filed a Security Interest Addendum to the Agreement that was agreed to by Semcon, Quest, and IV16.  *See* Ex. 10, Semcon Security Interest Addendum (the "Semcon SIA").  On information and belief, there is a materially identical Security Interest Addendum to which Mariner, the plaintiff in this case, is a party (a "Mariner SIA").[5]

The Semcon SIA retains in IV16 a security interest in the patents purportedly transferred to Semcon until Quest satisfies the obligation to pay the full $3 million patent purchase price.  *See* Ex. 10, Semcon SIA.[6]  The IV16 security interest imposes certain key restrictions regarding the disposition of the assigned patent rights.  First, until the full $3 million purchase price is satisfied, neither Quest or Semcon can "(i) sell, exclusively license, transfer, assign or otherwise dispose of the [relevant patents], or (ii) grant licenses under the [relevant patents] that include sublicense rights except for rights to grant sublicenses to subsidiaries of such licensee . . . without [IV16's] prior written consent."  *See* Ex. 10, Semcon SIA at ¶ 2.  Additionally, even if IV16 is willing to consent to any disposition of the assigned patent rights,

---

[5]   MediaTek in no way waives any arguments it could make should a Mariner SIA exist that differs in any way from the Semcon SIA, or, in the alternative, if a Mariner SIA does not exist.

[6]   According to documents filed with the SEC, Investor United Wireless Holdings paid the first $1 million installment on behalf of Quest on October 22, 2015 in return for a junior security interest, also secured by Patent Nos. 5,650,666 and 5,846,874 and by litigation proceeds.  *See* Ex. 4, Annual Report at p. 2.  United Wireless also agreed to make the remaining $1 million installment payments on November 22, 2016 and 2017.  *See id.* at p. 7.

Quest must first satisfy all outstanding payment obligations prior to so disposing of the rights. *Id.*  On information and belief, a Mariner SIA exists that places identical limits on Mariner.

IV16 recorded its security interest on November 13, 2016, and, on information and belief, neither Quest nor its investor United Wireless Holdings has paid the remaining $2 million balance owed for the patents.  *See* Ex. 11, Delaware Filing Summary No. 2015 5354617, dated November 13, 2015; *see also* Ex. 4, Annual Report at p. 2, 7.

The Semcon SIA identifies remedies that IV16 may pursue in the event of breach. Under the agreement, if Quest does not cure the breach within 5 days after notice, IV16 has an immediate right to pursue any remedies identified in the agreement and "any other remedies available under the applicable laws or in equity, including, without limitation, the remedies of a secured party under the applicable UCC."  *See* Ex. 10, Semcon SIA at ¶ 6.  Delaware law, which governs the Agreement, *see* Ex. 8, Agreement at ¶ 6.3, states that "[a]fter default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing."  2016 Del. Code Ann. tit. 6, § 9-610 (West).  On information and belief, there is a materially identical Mariner SIA.

D.     **The patent allegations asserted by Mariner**

Following the purported assignment of the patents from Quest, Mariner filed its Complaint against MediaTek on April 25, 2016.  (Dkt. 1).  As noted above, the Complaint accuses MediaTek of directly infringing the two patents, Patent Nos. 5,**56**0,666 and 5,846,874. Mariner's generic pleadings with respect to direct infringement fail to plead facts sufficient to provide MediaTek with fair notice as to its allegations.  According to the Complaint, Patent Nos. 5,**56**0,666 and 5,846,874 relate to anchor structures that are placed in the corners and around the edges of a semiconductor die to prevent cracks in the die due to stress.  However, Patent No.

5,**56**0,666 actually relates to a rack system for pick-up trucks.  *See* Ex. 12, United States Patent No. 5,560,666.

With respect to its only allegation, that of direct infringement, Mariner concludes that MediaTek infringes Patent Nos. 5,**56**0,666 and 5,846,874 "by making, using, offering to sell, selling and/or importing" infringing products and that "[u]pon information and belief, these products include at least the MT5396SGDJ SoC."  Compl. at ¶¶ 14 and 19.

Accordingly, Mariner's Complaint should be dismissed for lack of standing and because it fails to set forth the basis for the allegations made.

## ARGUMENT

## I       Mariner lacks standing to sue for patent infringement

IV16 retained substantial rights to Patent Nos. 5,650,666 and 5,846,874, rendering the purported "assignment" to Quest a mere nonexclusive license.  And, because Quest could transfer no greater right to the patents than it possessed, Mariner can likewise be no more than a nonexclusive licensee.  And indeed it appears that Mariner has no rights at all to Patent No. 5,**56**0,666.  Mariner lacks standing to bring this action, and this Court therefore lacks subject matter jurisdiction over the matter and should dismiss the action.

### A.      Intellectual Ventures Assets 16 failed to transfer all substantial rights in the patents to Quest, rendering the "assignment" to Quest merely a non-exclusive license

Standing is required to bring an action in federal court and must be present when plaintiff files its complaint.  *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005).  Plaintiff bears the burden of establishing standing and must suffer an injury.  *Id.* at 976.  Standing includes both constitutional and prudential requirements.  *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1338 (Fed. Cir. 2007).  Notwithstanding a document titled "Patent Sale Agreement," Quest has not "received an express or implied promise of exclusivity under the

patent[s], *i.e.*, the right to exclude others from making, using, or selling the patented invention,"

and therefore, regardless of the label applied to any transfer agreement by IV16, Quest has a

"bare license" to Patent Nos. 5,650,666 and 5,846,874.  *Propat Int'l Corp. v. RPost Inc.*, 473

F.3d 1187, 1193-94 (Fed. Cir. 2007).  While an exclusive licensee may join as a co-plaintiff, as a

nonexclusive licensee without all substantial rights to Patent Nos. 5,650,666 and 5,846,874,

Quest has no standing to sue for infringement on those patents.

> 1)  Courts look to the operative agreement transferring rights, rather than its
> title, to determine the substance of the grant

"To determine whether an assignment of patent rights was made, we must

'examine whether the agreement transferred all substantial rights' to the patents and 'whether the

surrounding circumstances indicated an intent to do so.'"  *AsymmetRx, Inc. v. Biocare Medical,*

*LLC*, 582 F.3d 1314, 1319 (Fed. Cir. 2009) (*quoting Vaupel Textilmaschinen KG v. Meccanica*

*Euro Italia SPA*, 944 F.2d 870, 874 (Fed. Cir. 1991)).  The label or title given to an agreement is

not dispositive; rather, a court must look to the substance of the agreement to determine whether

it transfers all substantial rights to a patent.  *Diamond Coating Techs., LLC v. Hyundai Motor*

*Am., et al.*, 823 F.3d 615, 618 (Fed. Cir. 2016)  ("On its face, 'the entire exclusive patent right'

must include all substantial rights in the patent.  We have not allowed labels to control by

treating bare formalities of 'title' transfer as sufficient to determine that an 'assignment' of the

entire exclusive right has occurred.") (*citing Vaupel* 944 F.2d at 874); *see also Secure Axcess,*

*LLC v. Dell Inc., et al.*, No. 6-11-cv-00338 (E.D. Tex. September 24, 2012), slip op. at 4[7]

("Whether a transfer is an assignment or a license is determined by the transfer's legal effect and

not by how the parties characterize the transfer.") (internal citation omitted).

---

[7]  All unpublished cases referenced herein are attached to the Declaration of Brandon C. Martin
as Ex. 13.  Cited portions are highlighted for the Court's convenience.

2)   A plaintiff in a patent infringement suit must have "all substantial rights" to establish standing

The Federal Circuit in *Morrow v. Microsoft Corp.*, 499 F.3d 1332 (Fed. Cir. 2007) explained that plaintiffs in a patent infringement suit typically fit into three general categories: (1) a party that can sue independently, typically the patent title owner; (2) a party that has standing to sue, but only as a co-plaintiff with the patent title owner; and (3) a party that has insufficient rights to the patent and therefore has no standing to sue, alone or as a co-plaintiff. *Id.* at 1339-41.  A party that possesses all exclusionary rights or all substantial rights in a patent and suffers a constitutional injury has independent standing to sue.  *Id.* at 1340.  Generally, only a patent owner has standing to file suit in its own name.  *Textile Prods., Inc., v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998).  However, one exception is that a Court will treat an exclusive license like an assignment for the purposes of standing, and consequently allow the exclusive licensee to sue in its own name, if the license conveys to the licensee all substantial rights in the patented technology.  *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991); *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000) ("A party that has been granted all substantial rights under the patent is considered the owner regardless of how the parties characterize the transaction that conveyed those rights.").

(a)   *An exclusive licensee may hold sufficient exclusionary rights to establish prudential standing*

Parties that hold exclusionary rights, but not all substantial rights, "are often identified as exclusive licensees, because the grant of an exclusive license to make, use, or sell the patented invention carries with it the right to prevent others from practicing the invention." *Morrow*, 499 F.3d at 1340.  "To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within the given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention

within the territory as well." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995). Where such a licensee is injured by an infringing act, that party may have prudential standing to sue *in conjunction with the patentee*. *Morrow*, 499 F.3d at 1340 ("[T]hese exclusionary rights must be enforced through or in the name of the owner of the patent, and the patentee who transferred these exclusionary interests is usually joined to satisfy prudential standing concerns.") (internal quotes omitted); *Rite-Hite*, 56 F.3d at 1552 (Fed. Cir. 1995) ("Under certain circumstances, licensees "may possess sufficient interest in the patent to have standing to sue as a co-plaintiff with the patentee."). Joining the patentee in a suit limits the possibility of multiple suits brought against a defendant for a single act of infringement. *Morrow*, 499 F.3d at 1340; *see also* Fed. R. Civ. P. 19(a).

> **(b)** *A party that has not received a promise of exclusivity is a mere licensee without standing*

A party that has not received the patent owner's express or implied promise of exclusivity, *i.e.*, the right to exclude others from making, using, or selling the patented invention, has a "bare license" and has received "only a covenant from the patentee that it will not be sued for infringing the patent rights." *Propat*, 473 F.3d at 1193-94. Without receiving a promise of exclusivity under the patent, a party cannot obtain standing in an infringement action, even as a co-plaintiff. *Morrow*, 499 F.3d at 1340; *Sicom*, 427 F.3d at 976 ("[A] nonexclusive license confers no constitutional standing on the licensee to bring suit or even to join with the patentee."). Therefore, where a party has not received sufficient substantial rights, courts consider the transfer a mere license.

> **(c)** *Federal Circuit precedent identifies certain "substantial rights" that are critical to the standing inquiry*

While not an exclusive list, the Federal Circuit has identified certain factors courts should consider to determine whether a patent owner transferred sufficient rights in a patent:

(1) "the exclusive right to make, use, and sell products or services under the patent is vitally important to an assignment;" (2) "the scope of the licensee's right to sublicense;" (3) "the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement;" (4) "the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee;" (5) "the duration of the license rights granted to the licensee;" (6) "the ability of the licensor to supervise and control the licensee's activities;" (7) "the obligation of the licensor to continue paying patent maintenance fees;" and (8) "the nature of any limits on the licensee's right to assign its interests in the patent."

*Alfred E. Mann Found. For Sci. Research v. Cochlear Corp.*, 604 F.3d 1354, 1360-61 (Fed. Cir. 2010) (*citing Propat*, 473 F.3d at 1193-94; *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001); *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 240 F.3d 1016, 1018 (Fed. Cir. 2001); *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1378-79 (Fed. Cir. 2000); *Vaupel Textilmaschinen*, 944 F.2d at 875).

Federal Circuit precedent instructs that the exclusive right to practice a patent, combined with the exclusive right to sue for infringement, is "the most important consideration" in determining whether a party possesses all substantial rights. *Id.* at 1362 (Fed. Cir. 2010); *see also Abbott Labs v. Diamedix Corp.*, 47 F.3d 1128, 1132 (Fed. Cir. 1995) ("[T]he transfer of the exclusive right to sue [is] particularly dispositive[.]") (*citing Vaupel*, 944 F.2d at 875).

Also strongly considered is the ability of the receiving party to dispose or transfer its rights in the patent and to grant licenses. Retention of control by the assignor over either of these privileges can leave the assignee with less than all substantial rights, reducing the receiving party to a mere licensee. *See Diamond Coating*, 823 F.3d at 620; *Prima Tek II*, 222 F.3d at 1380 ("A licensee's right to sub-license is an important consideration in evaluating whether a license agreement transfers all substantial rights."); *see also Sicom*, 427 F.3d at 979 (characterizing

restrictions on licensee's right to assign the patent as "fatal" to the transfer of all substantial rights).

In *Diamond Coating Technologies, LLC v. Hyundai Motor Am., et al.*, the Federal Circuit recently affirmed the dismissal by a district court for lack of standing based on the failure by Sanyo to assign substantial rights to the "assignee" Diamond.  Diamond and Sanyo entered into a Patent Assignment and Transfer Agreement, allegedly assigning legal title to the patents-in-suit to Diamond.  *Diamond Coating*, 823 F.3d at 617.  The district court found, and the appellate court agreed, that Sanyo did not convey all substantial rights to the patents-in-suit, focusing specifically on the retention by Sanyo of (1) "the right and license to make, use and sell products covered by the patents-in-suit," and (2) "significant control over Diamond's enforcement and litigation activities."  *Id.* at 619-620.  With respect to the second point, the Court noted that the transfer agreement "cabins Diamond's authority to license the patents-in-suit."  *Id.* at 620.  Because the assignment did not transfer all of the substantial rights to the patents, the Court found that the purported "assignment" was not, in fact, an assignment and dismissed the case for lack of standing.

Similarly, in *Sicom Systems Ltd. v. Agilent Technologies, Inc.*, 427 F.3d 971 (Fed. Cir. 2005), the Court considered whether Sicom had standing as an "effective patentee" where, under an agreement between Sicom and the Canadian government, Canada retained legal title to the patent-in-suit and reserved rights to:

> (1) continue operating under the patented technology; (2) veto proposed sublicenses; (3) grant contracts to further develop the [ ] patent; (4) sublicense any improvements or corrections developed by Sicom; and (5) sue for infringement . . . except for 'commercial infringement actions.'   Additionally, Sicom could not assign its rights without Canada's approval, nor bring suit without first notifying Canada.

*Id.* at 973.  Finding that Sicom did not receive all substantial rights in the patent, the Court

upheld the ruling of the district court that "the restriction on Sicom's right to assign was a fatal

reservation of rights by Canada."  *Id.* at 979 (internal citation and quotation omitted).

> 3)  <u>Quest did not receive all substantial rights to the patents and is, at most, a mere licensee</u>

Several critical factors identified by the Federal Circuit in *Alfred E. Mann*

(discussed above) indicate that IV16 failed to transfer to Quest all substantial rights to the

patents, including the limits on the right of Quest to assign its interests in the patents; the

exclusive right to make, use, and sell products or services; the scope of the right to sublicense;

and the reversion of rights to IV16 following breach of the patent sale agreement by Quest.  *See*

*Alfred E. Mann Found. For Sci. Research*, 604 F.3d at 1360-61.

> (a)  *Mariner does not have the right to dispose of Patent Nos. 5,650,666 and 5,846,874*

"The right to dispose of an asset is an important incident of ownership, and such a

restriction on that right is a strong indicator that the agreement does not grant [ ] all substantial

rights under the patent."  *Propat*, 473 F.3d at 1191 ("The right to dispose of an asset is an

important incident of ownership, and such a restriction on that right is a strong indicator that the

agreement does not grant [ ] all substantial rights under the patent.").  The requirement that Quest

(and Mariner) obtain consent from IV16 prior to assigning or exclusively licensing the patent

rights therefore amounts to a "fatal reservation of rights."  Likewise, the limitation on the ability

of Quest (and Mariner) to grant sublicense rights further weighs in favor of a finding that Quest

(and Mariner) lacks substantial rights.  The fact that Quest may come into a full, unencumbered

right to dispose of or freely license the patents at some point in the future is immaterial.

The case cited by Semcon in its Opposition to STMicro's Motion is not to the

contrary.  *Aspex Eyeware, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336 (Fed. Cir. 2006) found that

an entity that only temporarily receives all substantial rights to the patents-in-suit from the patent owner did not have standing to sue.  *See Semcon* Matter, Dkt. No. 26 at 17.  Here, Mariner has not received ***all*** substantial rights to U.S. Patent Nos. 5,650,666 and 5,846,874, temporarily or otherwise.  Instead, Mariner may at some time in the future come into a full, unencumbered right to dispose of the patents.  Mariner does not currently possess that critical right, and under current precedent, standing is determined at the time of filing.  The Federal Circuit could not be more clear:  "As the district court found, 'the restriction on Sicom's right to assign' was a 'fatal reservation of rights by Canada.'"  *Sicom*, 427 F.3d at 979 (internal citation omitted); *see also*, *Propat*, 473 F.3d at 1194 ("The right to dispose of an asset is an important incident of ownership, and such a restriction on that right is a strong indicator that the agreement does not grant [ ] all substantial rights under the patent.").  According to documents that it filed with the SEC, Quest does not currently, and indeed never did, possess these critical ownership rights to Patent Nos. 5,650,666 and 5,846,874.

>           *(b)     IV16 retained substantial licensing rights*

IV16 did not transfer to Quest the exclusive right to exclude others from making, using and selling patented products.  Rather, in addition to restricting the ability of Quest to grant exclusive licenses and licenses with sublicense rights, IV16 retained significant licensing rights for itself and its affiliates.  Specifically, IV16 and its affiliates retained the right, in certain specified circumstances, "to grant a limited, nonexclusive, perpetual, irrevocable, royalty-free, fully paid-up right and license (without geographic restriction), under the [relevant patents], to any Prior Rights Holder to make, have made, use, sell, offer for sale, import, and otherwise commercialize any product or service."  Ex. 8, Agreement at ¶ 3.1(b).  These rights are significant.  IV16 can grant nonexclusive, irrevocable, fully paid-up license, without geographic restriction, to any prior rights holder.  *Id.*  IV16 can extend existing rights to ***affiliates*** of prior

rights holders, meaning IV16 can license to new, unlicensed entities.  *Id.*  And IV16 can exercise

these license rights to the extent necessary "to eliminate any liability that [IV16] or any of its

affiliates may have to such Prior Rights Holders," a vague and undefined limitation.

IV16's "Extension Rights" also allow it to "renew and extend the term of" and to

"modify or amend" preexisting licenses IV16 and/or its affiliates granted in the past.  *Id.* at ¶ 1.

IV16 can therefore modify the term and scope of these licenses.  "Prior Rights Holders" have the

right to grant sublicenses to subsidiaries, another expansive provision allowing an unidentified

group of entities to grant new license rights to an indeterminate number of subsidiaries.  *Id.*

"[T]he right to license third parties is an important patent right because implicit in

the right to exclude is the right to waive that right; that is, to license activities that would

otherwise be excluded."  *Morrow*, 499 F.3d at 1342.  IV16's restrictions to the licensing rights of

Quest (and Mariner) and retention of its own licensing rights further demonstrate that Quest (and

Mariner) did not receive all substantial rights to Patent Nos. 5,650,666 and 5,846,874.

While an assignee may assume title to patents subject to existing licenses and

therefore steps into the shoes of the previous patent owner, that is not a fair characterization of

the licensing rights retained by IV16.  Neither Quest nor Mariner simply steps into the shoes of

IV16 and takes ownership of Patent Nos. 5,650,666 and 5,846,874 subject to prior existing

licenses.  The Agreement does not obligate Quest or Mariner to grant new licenses or to modify

and amend the scope of prior license to the extent IV16 was previously obligated to do so.

Rather, IV16 retains this licensing control itself.

This reservation of rights is more than a mere grant back of a sublicense.  *Cf. IP*

*Innovation L.L.C. v. Google, Inc.*, 661 F.Supp.2d 659, 665-66 (E.D. Tex. Sept. 21, 2009)

(transferor was obligated to refer "license inquires" to the transferee and could complete

authorized sublicensing negotiations only if transferree was unable to do so within six months); *Mediatek, Inc. v. Sanyo Elec. Co. Ltd., et al.*, No. 6:05-cv-00323-LED, 2007 WL 5186792 (E.D. Tex. April 16, 2007)  at *3, *6 (agreement "create[d] a contractual obligation for [transferree] to grant new nonexclusive, nontransferable license with no right to sublicense under certain conditions" and transferor did not "retain the right to grant new licenses itself").  IV16 can modify, amend, renew, and extend the term of licenses for prior rights holders and their affiliates without authority from, or notice to, Quest (and Mariner).  *See* Ex. 8, Agreement at ¶ 3.1(b).

While IV16 labeled the agreements with Quest a "sale" and an "assignment," it clearly did not transfer all substantial rights to Quest.  "Bare formalities of 'title' transfer" are insufficient to establish an assignment.  *Diamond Coating*, 823 F.3d at 618.  Rather, the substance of the grant is dispositive.  Because Quest does not have all substantial rights to Patent Nos. 5,650,666 and 5,846,874, Quest is a mere nonexclusive licensee.  And, while an exclusive licensee may have standing to bring or join an action as a co-plaintiff, a nonexclusive licensee such as Quest cannot join a patent infringement suit.  *Morrow*, 499 F.3d at 1340; *Sicom*, 427 F.3d at 976 ("[A] nonexclusive license confers no constitutional standing on the licensee to bring suit or even to join with the patentee.").

### B.   Mariner is, at most, a mere licensee without standing to sue for infringement

It is axiomatic that "a seller cannot pass better title to . . . property than he possesses."  *Barlow v. Stevenson*, 2000 Del. C.P. Lexis 62, at *4 (Del. C.P. 2000); *Prima Tek II*, 222 F.3d at 1382 ("an owner or licensee of a patent cannot convey that which it does not possess").  Therefore, the limitations on the patent rights imposed by the transfer between IV16 and Quest also limit any rights transferred by Quest to Mariner, meaning the rights Mariner received are limited by the specific prohibitions on disposition and licensing and by the retention of licensing rights by IV16.  Consequently, Mariner would be, at most, a nonexclusive licensee

without standing to sue for infringement.  As such, this case should be dismissed for lack of subject matter jurisdiction.

### C. At minimum, Intellectual Ventures Assets 16 and any other holders of substantial rights are necessary parties required to be joined to satisfy standing

As described above, IV16 transferred Patent Nos. 5,650,666 and 5,846,874 to Quest subject to "vital" limitations that are "fatal" to standing, including the control by IV16 of Quest's right to dispose of, to exclusively license, and to grant licenses with sublicense rights. IV16 likewise retained certain specific licensing rights for itself and its affiliates.  Although IV16 did not retain all substantial rights, such as the exclusive right to sue for infringement, an assignment nonetheless requires transfer of *all* substantial rights.  *See Enzo APA & Son, Inc. v. Gepag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998) ("Any less than a complete transfer of these rights is merely a license, in which case the title remains with the owner of the patent and the suit must be brought in its name.").  Because IV16 retained critical substantial rights, Quest does not have independent standing to sue for patent infringement, without joining the other holder(s) of any other substantial rights as necessary parties.  Because Quest cannot transfer rights beyond those it received, to the extent this Court finds that Mariner received any rights from Quest, Mariner likewise does not have independent standing to sue.

## II   Mariner's Complaint fails to state a claim upon which relief can be granted

In the alternative, this Motion respectfully seeks dismissal of Mariner's Complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).  Regional circuit law governs such motions.  *In re Bill of Lading Transmission and Processing Sys. Patent Litig.*, 681 F.3d 1323, 1331 (Fed. Cir. 2012) (*citing McZeal v. Sprint Nextel Corp.*,  501 F.3d 1354, 1355-56 (Fed. Cir. 2007)).

## A.   Mariner's Complaint must demonstrate some basis for its allegation and allege specific facts in support of each claim

As a threshold, Fed. R. Civ. P. 8 requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotation omitted and alteration in original).  The complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.  The "mere possibility of misconduct" is not enough.  *See Iqbal*, 556 U.S. at 679.  A complaint that simply alleges facts consistent with liability "stops short of the line between possibility and plausibility" and is deficient.  *Twombly*, 550 U.S. at 546.  Rather, a complaint demonstrates plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

In patent infringement cases, the Federal Circuit previously held that compliance by a patent plaintiff with Form 18 of the Federal Rules of Civil Procedure was sufficient to avoid dismissal under Rule 12(b)(6).  *See Bill of Lading*, 681 F.3d at 1334.  However, since the abrogation of Form 18 on December 1, 2015, district courts apply a pleading standard consistent with *Twombly* and *Iqbal*.  *See, e.g.*, *Ruby Sands LLC v. American National Bank of Texas*, No. 2:15-cv-01955-JRG, 2016 WL 3542430 (E.D. Tex. June 28, 2016) at *2, *4; *Solocron Education, LLC v. HealthStream, Inc*., No. 2:16-cv-00016-JRG (E.D. Tex., June 7, 2016), slip op. at 6 ("While the abrogation of Form 18 does not require plaintiffs to augment their complaints with element-by-element infringement contentions, claims for direct infringement must nevertheless satisfy the pleadings standards set forth by the Supreme Court in *Twombly* and *Iqbal*.").

To state a claim for direct infringement, a plaintiff must explicitly plead facts to plausibly support the assertion that a defendant "without authority makes, uses, offers to sell, or sells any patented invention during the term of the patent, within the United States."  35 U.S.C. § 271(a); *Bowlby v. City of Aberdeen*, 681 F.3d 215, 217 (5th Cir. 2012).  Importantly, such a complaint must give a defendant sufficient notice as to what he must defend.  *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007).  Conclusory statements that recite the elements of an infringement claim are not entitled to a presumption of truth.  *See Iqbal*, 556 U.S. at 678; *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (A court "will [] not accept as true conclusory allegations or unwarranted deductions of fact.") (internal citation omitted).

**B.**   **Mariner's Complaint fails to plead sufficient facts to support its direct infringement claims**

The Court should dismiss Mariner's direct infringement claims with respect to Patent Nos. 5,**56**0,666 and 5,846,874 (Counts I-II) because the Complaint fails to provide MediaTek with fair notice as to the basis for its direct infringement allegations and therefore fails to satisfy the pleading standards required by *Twombly*/*Iqbal*.

1)   Mariner fails to allege facts about infringing acts in the United States

Direct infringement is properly plead only if Mariner has plead facts that make it plausible that, "***during the term***" of an asserted patent MediaTek infringed such patent in the United States.  *See* 35 U.S.C. §§ 271(a) ("makes, uses, offers to sell, or sells any patented invention, ***within the United States***, or ***imports into the United States*** any patented invention") (emphasis added)); 271(f)(1) ("supplies or causes to be supplied ***from within the United States*** all or a substantial portion of the components of a patented invention . . ." (emphasis added); 271(f)(2) ("supplies or causes to be ***supplied in or from the United States*** any component of a

patented invention that is especially made or especially adapted for use in the in the invention and not a staple article or commodity . . .") (emphasis added); 271(g) ("*imports into the United States* or offers to sell, sells, or uses *within the United States* a product which is made by a process patented in the United States") (emphasis added).  "[E]xtraterritorial activities . . . are irrelevant . . . because the right conferred by a patent under our law is confined to the United States and its territories, and infringement of this right cannot be predicated o[n] acts wholly done in a foreign country."  *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1251 (Fed. Cir. 2000) (internal citation, quotation marks omitted).

   As Mariner's Complaint alleges, MediaTek Inc. is a Taiwanese corporation.  *See* Compl. at ¶ 2.  The Complaint contains no *factual* allegations that would allow one to conclude that either MediaTek Inc. or MediaTek USA Inc. imported, made, used, sold, offered to sell the MT5396SGDJ system-on-chip ("SoC"), the sole accused product, *in the United States*, at any time at all, let alone before Patent Nos. 5,<u>65</u>0,666 and 5,846,874 expired last November.  Instead it offers only legal conclusions that MediaTek "mak[es], us[es], offer[s] to sell, sell[s], and/or import[s] into the United States" the MT5396SGDJ SoC.  *See* Compl. ¶¶ 14 and 19.  These conclusions are lifted directly from 35 U.S. §§ 271(a) and (g).  Compare *id.* with Compl. ¶¶ 14 and 19.  Courts are not required to accept "as true . . . threadbare recitals of a cause of action's elements," "[t]hreadbare recitals of the elements of a cause of action . . . do not suffice" to give MediaTek notice of the nature of the claim made against it.  *See Iqbal*, 556 U.S. at 678.

   Mariner's assertions in paragraphs 2 and 3 of the Complaint that, "[u]pon information and belief, Media[T]ek, Inc. does business in Texas, directly or through intermediaries" and that "Media[T]ek USA Inc. is a Delaware corporation with a place of business" in Austin, Texas, do not change the analysis.  Even taking these allegations as true,

doing business in a place is not the same as making, selling, offering to sell, or importing into

that place the sole allegedly infringing product identified by Mariner, the MT5396SGDJ SoC.

There is no factual allegation in the Complaint that would "allow[ ] the court to draw the

reasonable inference that the defendant[s] [are] liable for" any misconduct in the United States.

*See id.*

  2)  <u>Mariner fails to allege sufficient facts about how the MT5396SGDJ SoC</u>
      <u>infringes claims of Mariner's patents</u>

    Mariner does not identify any allegedly infringed claims or provide any facts to

support its claim that the MT5396SGDJ SoC infringes Patent Nos. 5,**56**0,666 (which Mariner has

no right to and has nothing to do with semiconductors), 5,**65**0,666 (infringement of which is not

alleged in the Complaint), or 5,846,874.

    The Complaint recites that "[s]emiconductors using anchor structures of the type

taught and disclosed in the patents-in-suit are found in many high definition televisions, hard

drives, touch screen controllers, and other widely available products.  These semiconductors

include system-on-chip ("SoC") integrated circuits" and then concludes that a single product, the

MT5396SGDJ SoC,  "[u]pon information and belief" infringes.  Compl. at ¶¶ 11,14, and 19.

    The Complaint alleges only: (1) that the patents cover anchor structures in

semiconductors (Compl. ¶ 10); (2) semiconductors using the covered anchor structures "include

. . . system-on-chip ('SoC') integrated circuits" (Compl. ¶ 11); (3) the MT5396SGDJ is an SoC

(Compl. ¶¶ 14 and 19); and (4) ergo, the MT5396SGDJ SoC satisfies each and every limitation

of "one or more claims of" Patent Nos. 5,**56**0,666 and 5,846,874 (Compl. ¶¶ 14 and 19).  Setting

aside the fact that the 5,**56**0,666 Patent is directed to a rack for pick-up trucks and has nothing to

do with semiconductors at all, and assuming, *arguendo*, that Patent No. 5,**65**0,666 is instead

alleged to be infringed, the Complaint still fails to provide notice to MediaTek of what it must defend.

Mariner's Complaint amounts to an unsubstantiated conclusion that semiconductors using the purported anchor structures described in Patent Nos. 5,**650**,666 and 5,846,874 include SoCs and because MT5396SGDJ is an SoC it infringes.  Even if the allegations were accepted as true, that conclusion does not necessarily follow because the Complaint lacks any allegation that the MT5396SGDJ SoC in particular uses a claimed anchor structure or how it does so.  The lack of such a factual allegation is unsurprising because Mariner does not say which of the claims it believes are infringed.  Because it does not identify at least one claim, Mariner can't allege that the MT5396SGDJ SoC practices the elements of such a claim.

The Preliminary Infringement Contentions ("PICs") Mariner served upon MediaTek on August 16, 2016, do not rectify the deficiency of Mariner's Complaint.  There is no factual allegation in the PICs that make it "plausible" that MediaTek imported, made, used, sold, or offered to sell the MT5396SGDJ SoC, the sole accused product, in the United States, at any time at all, let alone before Patent Nos. 5,**650**,666 and 5,846,874 expired last November.  This necessary element of infringement is entirely absent from both the PICs and the Complaint.

Mariner's generic and bare allegations are particularly insufficient when one considers the purported claimed invention.  Patent No. 5,**650**,666 has nine claims directed to an anchor structure formulated in a semiconductor die.  The anchor structure comprises an oxide layer disposed over a first metal layer that is disposed over a substrate layer.  This anchor structure is placed in an open field of a corner area of the die and positioned to be approximately perpendicular to a force vector impinging on the die at approximately a 45° angle.  Likewise,

Patent No. 5,846,874 recites 12 claims directed to methods of placing an anchor structure in a semiconductor die to prevent shear stress damage. Claims 1 and 2 of Patent No. 5,846,874 each recite a method of placing an anchor structure in a semiconductor device comprising the steps of (1) reserving a portion of open field area in the corners (Claim 1) or along the edges (Claim 2) of a semiconductor die and (2) placing the anchor structure comprising metal, oxide, and polysilicon therein. Claim 1 requires that the anchor structure be perpendicular to a force vector of shear stress passing at "approximately" a 45° angle with an imaginary horizontal line passing through the die. Claim 2 requires that the anchor structure is placed perpendicular to a resultant force vector of the shear stress impinging the die edges. Mariner makes no allegation as to how the purported anchor structure is formulated in any of MediaTek's products or how any of MediaTek's products practice any of the steps recited in any claim of the patents. While an element-by-element analysis may not be required, Mariner effectively avoided identifying any of the claimed inventions it alleges that MediaTek infringes by reciting only a generic description with no detail.

For these reasons, Mariner's allegations with respect to the patents (Counts I-II) fail to adequately plead direct infringement under the *Twombly/Iqbal* standard, and MediaTek respectfully requests that the Court dismiss these claims pursuant to Rule 12(b)(6).

## CONCLUSION

For the reasons stated herein, MediaTek respectfully asks this Court to dismiss Mariner's Complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) or for failure to join a necessary party pursuant to Fed. R. Civ. P. 12(b)(7), or, in the alternative, dismiss Mariner's Complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) and (8).

Dated:  September 1, 2016                    Respectfully submitted,

                                            By */s/ Harrison J. Frahn IV*
                                            Harrison J. Frahn IV (Cal. Bar 206822, *pro hac vice*)
                                            hfrahn@stblaw.com
                                            Brandon C. Martin (Cal. Bar 269624, *pro hac vice*)
                                            bmartin@stblaw.com
                                            SIMPSON THACHER & BARTLETT LLP
                                            2475 Hanover Street
                                            Palo Alto, California 94304
                                            Tel: (650) 251-5000
                                            Fax: (650) 251-5002

                                            Melissa R. Smith (Bar No. 24001351)
                                            melissa@gillamsmithlaw.com
                                            GILLAM & SMITH, LLP
                                            303 South Washington Avenue
                                            Marshall, Texas 75670
                                            Tel: (903) 934-8450
                                            Fax: (903) 934-9257

                                            ***Attorneys for Defendants***
                                            ***MediaTek Inc. and MediaTek USA Inc.***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on September 1, 2016 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).

*/s/ Melissa R. Smith*